Case number 22-4037 Norfolk Southern Railway Co v. Dille Rd Recycling LLC All arguments not to exceed 15 minutes per side. Mr. Tobias S. Los Eaton for the appellant Good morning, your honors. May it please the court, Tobias Los Eaton joined by my colleague Stephen Ledone from Sidley Austin for Norfolk Southern. I'd like to reserve four minutes for rebuttal. In an unprecedented decision, the district court held that a neighboring landowner can use state property law to permanently seize one-third of an active railroad right-of-way to carry on its business in a way that prevents the railroad from using that property for rail operations. That decision should be reversed. Everyone agrees. You say one third, is that the width away from the track that you had in mind? It is, your honor. The entire right-of-way along here is about just over a hundred feet wide. Dille Rd's entitlement would be 32 feet and that would leave only about 23 feet from the center line of the nearest track to Dille Rd's fence. So it would leave very minimal room for railroad operations. And that really is the key fact that I think the district court overlooked here. The district court correctly understood that Dille Rd could not adversely possess or assert an exclusive easement interest over this property. And that's because that kind of claim prevents the railroad from using the property for railroad operations should the need arise. And it's undisputed that this parcel of land falls within the ICTA's scope because it is immediately adjacent to the tracks, it's in the right-of-way, and the record shows that Norfolk Southern uses this kind of trackside parcel for storage, for maintenance access, for staging, for communications and signaling equipment. When you say it uses, you mean it uses in other places similarly adjacent to the track? Yes, exactly, your honor. And so the district court understood correctly that Dille Rd could not take an exclusive interest in this kind of property. And yet it ended up authorizing exactly the same practical result by granting a prescriptive easement that would similarly prevent most or all rail use of this property simply because it thought the easement would not exclude Norfolk Southern altogether. But under any approach to the ICTA preemption analysis, as the STB has applied it and as the other federal appellate courts have applied it, whether it's a question of exclusivity, whether it's conflicting use, whether it's unreasonable burden, what ultimately matters is not whether the railroad retains some access to its own trackside property, it is whether it can use the land for rail transportation if the need arises. And Dille Rd's own... That's twice now used the phrase, should the need arise. Yes. So would you concede in this case that you've not demonstrated any current need? Yes, I would agree, your honor. The record does not show that we are currently using it or that we have current plans to use it. But I would also submit that if there is one point that is established beyond dispute in all of the relevant authorities on this subject, it is that we do not need to show current use or current need or even current plans. What does that unassailable point come from? Does it come from the statute or from the STB interpretation? It comes from both the STB interpretations and then also the other federal appellate decisions that have adopted them. So the Fourth Circuit in Skidmore, the Seventh Circuit in Union Pacific, the Eighth Circuit in the city of Ozark, and the STB in both Owe Zoo and also 14500. All of those authorities uniformly hold that the prospect of future rail need is sufficient as long as the land comes within the statute scope in the first place to prevent a neighboring landowner or condemning authority from taking property in a way that would conflict with the rail use. So in this case, if we if we agree with your position, what does this mean? Will they have to move their their their whole yard, a junkyard, or will it simply mean that whenever you want to use it you can you can kick them out? Your Honor, our interest here is not in ejecting Dilley Road nor is it in extracting rent money from them. Our two concerns here are one, simply ensuring that the land remains available should a future railroad need arise, and two, formalizing any concerns around liability. Dilley Road's metal recycling business potentially presents environmental concerns. We are still the fee simple owner of the property under the district court's decision, so we are concerned that we would potentially be on the hook for that, absent some sort of insurance or indemnity arrangement. But provided that we can sort out those concerns, we're quite happy to have them stay there for as long as we don't need the parcel. Really the bottom line here is preserving this parcel for future rail transportation. They get the prescriptive easement. In effect, from your point of view, they become the landowner. You can't get in there. Exactly. The record shows that the prescriptive easement that the district court granted is an adverse possession claim in all but name. It is a gerrymandered adverse possession claim that Dilley Road quite creatively put forward after it became clear that exclusive claims along these lines are not permissible. And if you look at Dilley Road's witnesses own testimony, you will see that most, if not all, of this parcel, on their view, is useless and not available to Norfolk Southern. The front two-thirds of the parcel... Is there any assurance? So you made the statement that it's not your intent to eject them. Yes. The property. Is there assurances that that won't happen? So we would, of course, if they were going to stay on the property... Originally these were like you were negotiating, and then there was the lawsuits. So the best I can say, Your Honor, is we would be very happy to continue talking about a lease. As I said, our interest is ultimately just preserving the parcel for future rail use as part of the corridor. I can't, you know, swear that we would allow them to stay under any and all conditions, but we would be happy to try to reach an arrangement to do that. Presumably there could be some railroad operational necessity that all of a sudden you really need to put a signaling tower there. Exactly right, Your Honor. You would say that, but right now you don't know. That is correct, Your Honor. And the STB has explained, the Seventh Circuit said the same thing in Union Pacific, that because the existing rail network, including the existing width of the rights-of-way, really has to be able to accommodate any growth in future interstate rail traffic. That's why the statute protects this kind of land, even if there is no current plan for railroad use. Because we don't know. Maybe it's next year, maybe it's ten years from now. Growth in traffic on this line going up towards Erie may be sufficient. That signaling equipment is required here. Maybe it's something related to, you know, electrification. Maybe there's room for a spur track here. There's a yard a little bit north. These are all possible rail uses that, admittedly, at this point we can't predict, but we know from the case law that we don't have to be able to predict it for the statute's protections to apply. And the ultimate problem is, Dilley Road itself, although it says this is a non-exclusive claim, really has claimed the entire parcel, and certainly all of the useful area, for itself. Both Dilley Road's owner and its general manager said, the front two-thirds of the parcel, so the entire length from the road. By front here, you mean the front from the track, away from the track. So here it's actually, so maybe front isn't the right word. So it's, the parcel is about 32 feet wide and then runs parallel to the tracks for about 600 feet. And when I say front, I mean the 400 or so feet from the... Okay, so there we're talking sideways. Yes, I think of it as front, but sideways. The first 400 feet is all full of junk. The 200 feet, there's some open access once you get past the gate. Yeah, so, well, so the other way around, but otherwise exactly right, Your Honor. The portion of it from the gate going in is occupied by Dilley Road's inbound way station, with the ramps and their driveway adjacent to their building, and then the rest of it behind there. Even the 200 feet is behind all the junk. Yes, exactly. And that's, there are scrap heaps back there. I take it from other activities and documents here that some effort was made to mediate this, and at least at this point you were happy to come to beautiful Cincinnati rather than to settle this. I will certainly always happy to come visit Cincinnati, Your Honor, but from our perspective, frankly, the sticking point, once the district court ruled, was the existence of the railroad. Given our systemic interests in this issue across the entire rail network, we were greatly concerned by the existence of a federal court decision that says that somebody can take this kind of interest in railroad property. And really what this boils down to, I think, is the district court really did its level best to apply the STB's tests here, which I will freely confess are not always articulated in the most crystal clear fashion, and sort of lost the forest for the trees a little bit. The district court concluded that categorical preemption did not apply here because the claim was not an adverse possession claim or an exclusive prescriptive easement claim. And we can quibble about that, but candidly, I don't know that it matters that much whether you apply the STB's categorical test or if you apply their as-applied test, which focuses on, as this court said in Adrian and Blissfield, unreasonable burden on rail transportation. Because the district court's key error on the second prong, on the unreasonable burden prong, was simply failing to consider, as I explained a moment ago, that the case law does not require us to show a present burden or even concrete plans. There are some cases where the railroads lose. Those are typically like crossing, like crossing or getting from the silo to the cow field. Yes, exactly right, your honor. There is a distinct category of cases, what the STB calls routine, non-conflicting, non-exclusive easements for things like grade crossings, sewer pipes, and telephone wires going up in the air. And those are subject to the as-applied preemption analysis, and they are very rarely preempted. Because in almost every case, by nature, that kind of occupation creates no material impact on railroad operations now or in the future. If some kind of future issue does arise, it's very easily dealt with. The crossing can be relocated or expanded. The potential future material impact here is... The issue here, your honor, is that Dilley Road's occupation is such that we could not use, I would say, any of this parcel, but certainly most of it, for anything. And so we may well need, at some point in future, to use this parcel for maintenance access, for storage, for staging. I do think this would be a little bit short for a siding or a spur track, but there is about a thousand feet of total room, I think, on this side of the right-of-way. All of those are potential future rail needs that the growth in traffic on this line could necessitate. And as long as Dilley Road has a state law entitlement to occupy this parcel with a fence around it, with the Truxdale... It feels like the preemptive scope here is quite broad, but why isn't that true? Even if you're putting in a crossing, couldn't the railroad say, well, at some point we'd like to have... We'd like to use that land for some other reason. It feels like there's sort of like a public versus private use for some public use. The courts are sort of more willing to allow the incursion, or no incursion, I guess you would say, versus like a private use where it's recycling outfits only benefiting the recycling company. So we're supposed to be looking at it in a more favorable way or less favorable way to the plaintiff. Your Honor, there may be some sort of a realist public versus private thing going on in the background, but I think most of the time when the STP is distinguishing, say, grade crossings, what it's focused on is the practical reality that the number of grade crossings across the country, one, is something that frankly the board just is not interested in dealing with in every single instance, but two, so rarely presents any kind of operational problem that it's not worth doing this scrutiny every time the crossing issue comes up. But the board will still hold a crossing preempted if the specific facts show that there will be an unreasonable burden. So for example in the... You used the phrase, did I get it right, non-conflicting, non-occupational, or did I hear the last part? So non-conflicting and non-exclusive. That's the shorthand that the STB uses and that the Seventh Circuit repeated. Okay, because the grade crossing, when the farmer walks across the tracks, it's not exclusive. You can keep running the trains across it. Exactly right. A grade crossing is non-conflicting and non-exclusive because the surface occupation is incredibly minimal. It's really just the lights and gates and of course the concrete itself. And that presents no challenge to the train, you know, still coming through. And in that situation, the rail use wins out because when the train comes, the gates go down, the traffic has to wait. And if it is necessary, say, to build a siding or another track next to an existing track where there's a crossing, that's very easily done. The crossing just gets expanded and in fact, oh, sorry, I see my time is up. I was saying presumably something like air rights is also, I mean if somebody, you know, needed some kind of an overpass a hundred feet in the air, again, it would be non-exclusive because you're not... Exactly right, Your Honor. Yeah. Okay, great. Thank you. Thank you. From your friend on the other side. Good morning, Your Honors. My name is David Cuppage. May it please the court, I represent Dilley Road Recycling LLC and my colleague Tracy Francis is with me here today. Your Honor, we believe that the district court correctly applied well-established case law from this district and from the State Safety Transportation Board to the unique factual circumstances presented by the record below to hold that the Termination Act does not preempt Dilley Road's declaratory judgment action for a non-exclusive prescriptive easement. And I would submit that the starting point for the district court's decision and the starting point for this court is this court's previous decision in Adrian and Blissfield Railroad versus the village of Blissfield. And in that case, this court, and as did the Safety Transportation Board in cases that have been cited before this court, and frankly, I think pretty much all of the courts have held that the touchstone of the analysis is whether the state regulation imposes an unreasonable burden on railroading. And this court, I'm sorry, the district court considered whether the evidence, the evidence actually presented or imposed an unreasonable burden on railroading. And the court determined that Dilley Road's non-exclusive prescriptive easement did not impose an unreasonable burden on railroading. If you call it a non-exclusive, how is not the 400 feet at a minimum full of junk exclusive to the railroad? Well, it's non-exclusive because the railroad can use the property as we are using the property. The fact that we might be using... As you are using it so they can put junk on it? If they want to come on and there's places that they can put equipment on, machinery on, but Your Honor, I would actually... Your junk. Well, I don't know if we do or not. I think this property is a long but very narrow, and I want to point this out, it's a very narrow strip of property. And I think what's really key to the district court's decision and what was key, I think, to what the court's analysis was, is there was absolutely no evidence whatsoever presented to the court below that the railroad could use this property for any purpose. There was just no evidence. There was no declaration signed by anyone from the railroad that said we could use this for equipment. There was no declaration in the record or testimony in the record from the railroad that said we could use this for anything. There was just an absolute lapse of evidence. And your decision was could versus would? I guess what I'm saying, Your Honor, is could versus would is all hypothetical because the court below decided the case on the evidence. And if the railroad wanted to present evidence, if it had evidence, if it wanted to present evidence that it could use this property, hypothetically in the future it had the ability to do so. It could have signed, there could have been a declaration that said we could use this property for the purposes of railroading, whether it was to stretch equipment. But why would we assume that they couldn't use the property? I mean, with the exception of the marshy land that apparently nobody wants to use because everything sinks, if it's land, why wouldn't it be usable? I'm not following your argument here. Well, it's usable for something, but is it usable for the Well, if they wanted to put a switching station, it's land, they could put a switching station on it, couldn't they? Why would they need a declaration? I don't know if they could, Your Honor. I honestly don't know if they could because there's no evidence in the record that said they could. But isn't that true of all the land for 100 miles along the railroad? If Walmart wants to put something, you know, 50 miles down the road, does the railroad have to show that it could use its own property to do something? I think if the railroad wants to prove that there is an unreasonable burden on railroading so as to trigger an as-applied preemption analysis, it's the railroad's burden and obligation to present evidence that the prescriptive easement actually burdens the railroad's operations. And since 1906, there has been absolutely no use of this property for railroading purposes. And the record was very clear, since 1906, they didn't use the property, they've never used the property, they currently aren't using the property, and there was no plans in the future to use the property. So 1906 was when the... That's when this little sliver... No, no, no. That's when the sliver, this piece of property that's in dispute became part of the railroad corridor. So they bought the land from somebody? They acquired it from someone. I'm not sure how. At the time, there was nothing on it? There was nothing on it. I think it was in... Did the junkyard simply encroach from further away? Well, so the record, Your Honor, indicates that since 1994, a fence was installed in the location where it's currently installed. This is where they fenced off... That's when they fenced it off. The land that they liked to use, the railroad is the owner of. Incidentally, in the discussions, this point about RCRA... He didn't use the word RCRA. I did. Liability. I mean, if it turns out that you guys are leaking something evil, do you agree that an injured party could go after the landowner? I think under RCRA or CERCLA, there would be litigation and the courts would be... Right, sure, there'd be litigation and the courts would be tasked with determining... It's not a fantastical idea. Railroads are notoriously environmentally challenged. I mean, just everywhere. Okay. But to answer your question, 1991, Dilley Road's predecessor acquires the property. 94 is when the fence is installed. At some point between 1906 and 1991, recycling materials started to encroach on the railroad property. Is that probably fair? We began operations leasing the property in 2007. 2007 is when the truck scale was installed on the property. We installed new fencing. So clearly for over 21 years, a prescriptive easement was established and that's what Judge Calabrese indicated. And that's not even... That's not a challenge. Okay, I'm trying to get a flavor of what's happening on the ground here. Okay. But to go to my point about there is absolutely no evidence in the record that this little sliver of property could be used for railroading. That's an important point. And I think if the court... We recently cited this CoCort. I think it's... I may be mispronouncing, but the CoCort case basically says, look, if the railroad wants to prove preemption, it's on them to submit evidence that they can use or they could use the property for railroading. Isn't this case distinguishable because it's a complete preemption case and so the only question was whether the case had to be heard in federal court, which is a different question than whether there's... CoCort was a title by acquiescence case. And the court actually applied this touchstone analysis though to determine whether the... It says as applied preemption under the ICC Termination Act occurs when state law claims would prevent or unreasonably interfere with railroad transportation as applied. It wasn't analyzing whether it was complete preemption for purposes of federal jurisdiction in the case opposed to whether there was just ordinary preemption by application of the statute to the use of the land. I don't know. I just thought it was distinguishable. I think there may be some distinctions there, Your Honor. At the end of the day... Where do we find a law that says that the railroad has to demonstrate an expected or potential use of the land? In other words, we could pretty easily imagine uses, but I take your point that maybe I'll ask the railroad when they... I take your point that maybe they weren't concrete or maybe they were entirely silent on how they might use the land, but why do they have to? What's the requirement that they have to? Because the court below, and I think it's in the Adrian and Blissfield case, says that hypothetical future inconvenience does not resemble clear, present, and tangible impacts the Surface Transportation Board has deemed undue... That's from the ZAO group? The ZAO group case, yes. The Middle District of Pennsylvania? That's correct. What were the facts of that case? The ZAO group case involved... Was this a crossing or was this more like a private recycler? My recollection is ZAO group filed some request with a Virginia administrative agency to pursue a condemnation action. And it was simply they filed a request, they had to get authority from some Virginia agency before they could pursue a condemnation action against the railroad. Oh, they were trying to condemn the railroad's property? Yeah, yes. And what happened is the court said, well, an adverse possession type case is in fact preempted. And I think on appeal that case... Is your prescriptive easement really an adverse possession? It's not. We have what we have, Your Honor. For all intents and purposes, because the railroad hasn't used the property, they have no plans to use the property, and they haven't presented any evidence that they could use the property, then we're the only ones using it. So does that mean it's exclusive? I don't think so. It means that we have a non-exclusive prescriptive easement to use it, but the fact that the railroad has never used the property, isn't planning on using the property, has no future needs to use the property. Just basically saying maybe someday we might use the property, but we can't give you any evidence that says we can use the property, because it's such a small sliver of property. One other thing then about facts on the ground. Do you own land further away from the railroad that also is part of this recycling facility? Yes, the recycling facility. We own land that's... Okay, so it's basically back here, and then it encroaches on the railroad land. It's... So you have Dilley Road. It's 32 feet wide, but your property, your facility is much more than 32. Oh yes, yes. There's actually a building. There's a driveway, and then... That's all on, undisputedly, your land. Yes, but it comes up... The disputed property comes up very, very close to the building. So the point is... The building is quite close to the railroad's land. The building has been there for... I don't know if the record even says how long... From before the memory of man run across to the contrary. Correct, well before we purchased it in 2007. Yes, and just sort of concluding here, I think the court below applied well-established precedent. It applied this court's decision in Adrian and Blissfield. It applied the touchstone analysis that this court has indicated is whether the state regulation imposes an unreasonable burden on railroading. It looked at the facts, and it came to the conclusion that this non-exclusive prescriptive easement had no impact. And really, there is no evidence of a... Your friend on the other side used the phrase, should the need arise. Do you think that's the right test? And then you're saying, but they didn't... I don't think that's the right test, Your Honor, because the case law says hypothetical future inconveniences does not permit a court to find... One case from the middle... That's the Zayo case. One case from the middle of Pennsylvania says that. Your quotation of a hypothetical, is that from Adrian and Blissfield, or is that from... I think it's from Zayo. It's from page 10 of Judge Calabrese's opinion. He quotes Zayo for that. He's quoting Zayo, not Blissfield. I believe that's correct. If I misspoke on that, I apologize. That was from Zayo group, and that is what the court below determined. I guess I would just conclude, Your Honor, by asking the railroad to identify in the record where there's evidence that this little sliver of property could be used for railroading purposes. It's not there. And for all of the reasons that I've stated today and in our briefs, we would ask that this court affirm the decision below. Thank you. Thank you. Your friend teed up an interesting question. Usually we ask the questions, but in this instance, maybe we'll defer to him. So is there anything in the record? Your Honor, I am very happy to oblige my friend's request. At page ID 1124, which is the deposition of Ms. Stone, who was Norfolk Southern's property agent, my friend had a colloquy with her about how we know that this property counts as part of the active rail corridor. And she said that it includes property that assists in the functioning of the rail line with the infrastructure. And he asked, how would we know that this kind of parcel counts? And she said, we can use those parcels for any number of reasons, including for primary or general access from the tracks for our maintenance of way folks to get down to the corridor. We use those for staging. If we have to repair any parts of the railroad, I know there's a bridge up there to the eastern part of this site. I could imagine that we would have to get some large equipment down there, so we would need some right of way to do that. Again, when it comes to staging, you're looking at area to store materials, ballast, railroad ties, spikes, plates, things along those lines. We use those parcels for... We could use it for communication and signaling equipment for our CNS folks. I'm trying to think if there's anything else that comes to mind. What is CMS? Communications and Signaling Department of the Railroad. Your Honor, that is undisputed, unequivocal testimony by our witness in this case about how we could use this parcel. It really is, though, sounds... Correct me if more. That's the way we use this kind of property. That is, if you asked me the same question half a mile up the track or half a mile down the track, I would tell you the same thing. I think it is both. This is how we use this kind of parcel in general, and we could use this parcel in this way. You mentioned something there about a bridge. Yes. Starting at the road crossing in front of the recycling facility, the right-of-way is about the same width, going northwest for about 1,000 feet. It then narrows a bit. There's a bridge there, and then it widens out again to a yard. That bridge is some way upstream, you might say, of this property, but you might want to connect the two in some way. Yes, Your Honor. I don't think that you have to even grapple with exactly, you know, is could or would, because my friend hung his hat on the absence of record evidence about how we could use this parcel. There it is, Your Honors. It's cited at pages 9 and 10 of our brief. My friend ignored it in his brief. We pointed it to, again, in our reply brief. I think the only other basis my friend gave you to suggest... Can I go to the... So we'll take... Moving on. The ZAO quote? Yes. Hypothetical future inconvenience? Yes. So at a minimum, that suggests a hypothetical future inconvenience. Yes. At least this one case says that's not enough. So there are three problems with my friend's reliance on the Pennsylvania decision in ZAO. There are actually two ZAO cases. There's one in Virginia, which my friend was talking about. Yes, there's also one in Pennsylvania. The one in Pennsylvania is distinguishable for two reasons, and just wrong for a third. It's distinguishable because it's a complete preemption case. It involved removal jurisdiction, as Your Honor pointed out, with respect to Coquit as well. It's also distinguishable because the occupation there was a non-exclusive aerial easement to string wires along a set of telephone poles that was already installed in the right-of-way for, I think, .9 miles or so. And ZAO there stipulated that it would agree to easement conditions that addressed Norfolk Southern's concerns about possible future need to relocate those poles. So there was simply no possible conflict on those facts. And finally, ZAO is wrong because that is the only authority that my friend has for this hypothetical future conflict rule. And the district court, likewise, cited ZAO for the idea that you need present and tangible impacts. But all of the cases I rattled off when I first stood up here, Skidmore, Owl Zoo, 14500, Union Pacific, City of Ozark, that's the STB and three other federal courts of appeals telling you that essentially a hypothetical future conflict is sufficient. Thank you. Thank you. Excellent arguments on both sides. The case will be submitted.